**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **NELSON DEPROW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:07CV85 CDP(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Nelson Deprow for Disability Insurance Benefits under Title II of the

Social Security Act, and Supplemental Security Income under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of

Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the

Answer. (Doc. No. 17).

**Procedural History**

On January 24, 2005, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on November 3, 2003. (Tr. 39-41, 77-81). This

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated October 27, 2006. (Tr. 31-35, 13-

- 1 -

20).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on April 11, 2007.  (Tr. 7, 3-6).  Thus,

the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

**Evidence Before the ALJ**

**A.     ALJ Hearing**

Plaintiff's administrative hearing was held on April 26, 2006.  (Tr. 380).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present were Gary Weimholt, vocational

expert, and JoAn Espada, witness.  (Id.).  The ALJ began by admitting the exhibits into evidence.

(Tr. 381).  Plaintiff's attorney stated that plaintiff had recently undergone testing at Dexter

Memorial Hospital and that he had not yet received those records.  (Id.).  The ALJ indicated that

he would allow plaintiff thirty days to submit those records.  (Id.).

Plaintiff's attorney then made an opening statement.  (Id.).  He stated that plaintiff suffers

from depression, personality disorder,[1] diabetes, elevated blood pressure, stomach problems, and

back problems.  (Tr. 382).  Plaintiff's attorney stated that plaintiff's diabetes and blood pressure

are controlled with medication.  (Id.).  He stated that plaintiff's biggest problems that prevent him

from working are his depression, personality disorder, and back problems.  (Id.).

The ALJ then examined plaintiff, who testified that he was thirty-four years of age and

was separated.  (Id.).  Plaintiff stated that he had been married one time and that he and his wife

---

[1]A general term for a group of behavioral disorders characterized by usually lifelong
ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle,
and social adjustment, which pattern may manifest in impaired judgment, affect, impulse control
and interpersonal functioning.  See Stedman's Medical Dictionary, 570 (28th Ed. 2006).

have separated many times throughout their marriage. (Tr. 383). Plaintiff testified that he has two children who live with their mothers. (Id.). Plaintiff stated that his children have two different mothers. (Id.).

Plaintiff testified that he completed the eighth grade and does not have a GED. (Id.). Plaintiff stated that he is six feet tall and weighs about 300 pounds. (Id.). Plaintiff testified that he has a commercial driver's license (CDL), which is still valid. (Id.). Plaintiff stated that he passed the CDL test the first time he took it. (Id.). Plaintiff testified that he has never been in the military. (Id.).

Plaintiff stated that he has been arrested for a traffic violation. (Tr. 384). Plaintiff testified that he stayed in jail for a weekend for driving on a suspended license. (Id.). Plaintiff stated that his license was revoked because he was riding a motorcycle without proper registration. (Id.).

Plaintiff testified that he lives with his mother. (Tr. 385). Plaintiff stated that his mother does not work outside of the home because she is disabled due to physical problems. (Id.). Plaintiff testified that he receives Medicaid benefits and food stamps. (Id.). Plaintiff stated that he shares food stamps with his wife. (Id.).

Plaintiff testified that he last worked as a janitor at a nursing home in Illinois. (Tr. 386). Plaintiff stated that he only worked at this position for three days because the job was difficult and because he moved back to Missouri. (Id.).

Plaintiff testified that he experiences depression, which prevents him from working. (Id.). Plaintiff stated that Dr. Knoll in Bloomfield treats him for his depression. (Id.). Plaintiff testified that Dr. Knoll is aware that he has applied for disability benefits. (Id.). Plaintiff stated that he did not know whether Dr. Knoll supports his disability application. (Id.). Plaintiff testified that Dr.

Knoll is his regular doctor and is not a psychiatrist. (Tr. 387).

Plaintiff stated that he does not use alcohol. (Id.). Plaintiff testified that he smokes about a package of cigarettes a day. (Id.). Plaintiff stated that he smokes generic cigarettes, which cost about $2.00 a package. (Id.). Plaintiff testified that he last used marijuana, cocaine, or methamphetamine years prior to the hearing. (Id.).

Plaintiff stated that he spends his time during the day sleeping. (Id.). Plaintiff testified that he does not do much else other than sleep. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he sleeps during the day because he is depressed. (Tr. 388). Plaintiff stated that his biggest problem preventing him from working is his depression. (Id.). Plaintiff testified that he has difficulty being around people. (Id.).

Plaintiff stated that he does not belong to any social organizations or clubs. (Id.). Plaintiff testified that he does not go to church or to his children's school activities. (Id.). Plaintiff stated that he does not shop for groceries. (Id.). Plaintiff testified that his mom does all the shopping. (Id.). Plaintiff stated that he only shops if he can use the drive-through. (Id.). Plaintiff testified that he drives occasionally. (Id.). Plaintiff stated that he only drives around town in Dexter. (Id.).

Plaintiff testified that he has experienced suicidal thoughts several times over the past couple years. (Id.). Plaintiff stated that he does not keep any guns in the house for this reason. (Id.). Plaintiff testified that he almost attempted suicide on one occasion. (Id.). Plaintiff stated that he placed a loaded gun to his head. (Id.). Plaintiff testified that his wife was living with him at the time. (Id.). Plaintiff stated that this occurred five to seven years prior to the hearing. (Tr.

390).  Plaintiff testified that he received inpatient treatment at the state hospital in Farmington after this incident.  (Id.).  Plaintiff stated that his daughter Brianna was a baby when this occurred. (Id.).

Plaintiff testified that he experiences a constant aching in his back and neck.  (Id.). Plaintiff stated that he injured his lower back in an automobile accident when he was fourteen years of age.  (Tr. 391).  Plaintiff testified that he was involved in another accident abut six years prior to the hearing.  (Id.).  Plaintiff stated that he injured his neck in the second accident.  (Id.). Plaintiff testified that he has not undergone surgery on his back or his neck.  (Id.).

Plaintiff stated that he has difficulty bending.  (Tr. 392).  Plaintiff testified that he also has difficulty getting up from a sitting position.  (Id.).  Plaintiff stated that when he stands, he experiences a constant ache.  (Id.).  Plaintiff testified that his back and neck have bothered him since the accidents.  (Id.).  Plaintiff stated that his back and neck sometimes bother him when he walks.  (Id.).

Plaintiff testified that he has difficulty lifting.  (Id.).  Plaintiff stated that he cannot lift his daughter who weighs 100 pounds.  (Id.).  Plaintiff testified that he can lift a gallon of milk.  (Tr. 393).  Plaintiff stated that he may be able to lift 25 pounds.  (Id.).

Plaintiff testified that his back has been pulled out of place before, at which time he had to crawl to the bathroom.  (Id.).  Plaintiff stated that this occurred when he was in his 20s.  (Id.). Plaintiff testified that he has not experienced pain at that level of severity in a long time.  (Id.).

Plaintiff stated that he has experienced some stomach problems, which he described as "sour stomachs."  (Tr. 394).  Plaintiff testified that everything he eats turns sour.  (Id.).  Plaintiff stated that he has been going to the doctor for this problem for the past month.  (Id.).  Plaintiff

testified that he underwent testing at Dexter Hospital.  (Id.).

Plaintiff stated that he does not participate in any hobbies.  (Id.).  Plaintiff testified that he does not have a social life and he does not attend church.  (Id.).

The ALJ next examined plaintiff's mother, JoAn Espada, who testified that plaintiff lives with her in her home.  (Tr. 395).  Ms. Espada stated that plaintiff has been living with her for about a year.  (Id.).

Plaintiff's attorney then examined Ms. Espada, who testified that plaintiff stays in bed all day on some days.  (Id.).  Ms. Espada stated that plaintiff is really depressed all the time.  (Id.).  Ms. Espada testified that plaintiff does not have a social life and does not want to go anywhere or do anything.  (Id.).  Ms. Espada stated that she encourages plaintiff to get out and see people but he refuses.  (Tr. 396).  Ms. Espada testified that plaintiff does not see his children very often.  (Id.).  Ms. Espada stated that his children occasionally visit him but he does not leave the house to do anything with them.  (Id.).

Ms. Espada testified that plaintiff does not shop with her.  (Id.).  Ms. Espada stated that plaintiff does not engage in any hobbies.  (Id.).  Ms. Espada testified that plaintiff gets up every day but sometimes he just lies around all day.  (Id.).  Ms. Espada stated that plaintiff does not read books or watch television.  (Id.).

The ALJ then questioned Ms. Espada, who testified that plaintiff spends most of his time in the house.  (Tr. 397).  Ms. Espada stated that plaintiff's brother tries to get him to go out with him but plaintiff will not go.  (Id.).  Ms. Espada testified that plaintiff's brother lives next door to them.  (Id.).  Ms. Espada stated that plaintiff does not leave the house most of the time.  (Id.).

The ALJ asked plaintiff's attorney to submit the medical records from Dexter and from

Farmington State Hospital. (<u>Id.</u>). He also indicated that he was requesting an evaluation with psychological testing. (<u>Id.</u>).

### B.    <u>Relevant Medical Records</u>

The record reveals that plaintiff was admitted voluntarily to Southeast Missouri Mental Health Center on July 23, 1997. (Tr. 167). Plaintiff complained of mood swings and suicidal thoughts of shooting himself and his family. (<u>Id.</u>). Plaintiff stated that he had been depressed with mood swings for the past year. (<u>Id.</u>). Plaintiff reported periodic use of marijuana and alcohol. (<u>Id.</u>). Plaintiff stated that he experiences panic attacks in Wal-Mart and that he isolates himself in his room, sleeping too much. (<u>Id.</u>). Plaintiff reported that he had been treated as an outpatient through Bootheel Counseling since September of 1996, with his last visit in January of 1997 due to his counselor leaving the facility. (<u>Id.</u>). Plaintiff had been treated with Effexor[2] and Paxil[3] in the past with no improvement. (<u>Id.</u>). Upon mental status examination, Zenaida Servando, M.D. found plaintiff's speech to be relevant and coherent and his flow of thought normal. (Tr. 168). Dr. Servando stated that plaintiff's mood was anxious and depressed and noted that he would smile inappropriately at times and expressed much anger at a multitude of perceived injustices and his current life situation. (<u>Id.</u>). Plaintiff's intellect was assessed as average and his insight and judgment impaired. (<u>Id.</u>). Plaintiff stated "I'm not suicidal. I said that because that's the fastest way to get here for low income people." (<u>Id.</u>). Plaintiff's wife stated that plaintiff was never

---

[2]Effexor is an antidepressant indicated for the treatment of depression. <u>See</u> <u>Physician's Desk Reference (PDR)</u>, 3392 (57th Ed. 2003).

[3]Paxil a psychotropic drug indicated for the treatment of major depressive disorder, panic disorder, and anxiety disorder. <u>See</u> <u>PDR</u> at 1603-05.

suicidal and that he always makes suicidal statements but has not made any suicide attempts. (Id.). Plaintiff did well during his stay and indicated that he would seek outpatient treatment. (Id.). Plaintiff indicated that he lied about being suicidal in order to be admitted and receive services. (Id.). Plaintiff was given Vistaril[4] for anxiety. (Id.). Plantiff was discharged on July 26, 1997. (Id.). Upon discharge, plaintiff was diagnosed with mood disorder and personality disorder and was assessed a GAF[5] of 75.[6] (Id.). It was recommended that plaintiff follow-up at Bootheel Counseling and see a psychiatrist to monitor medications. (Tr. 169).

Plaintiff presented to Crosstrails Medical Center on November 12, 2004, for a checkup of his blood sugar and concerns about depression. (Tr. 303). The doctor's impression was new onset diabetes, hypertension,[7] fatigue, migraines, obesity, and depression. (Tr. 304). Effexor was prescribed for plaintiff's depression. (Id.). Plaintiff presented to Crosstrails Medical Center for a follow-up on November 24, 2004. (Tr. 301-02).

Plaintiff presented to Bootheel Counseling Services on December 7, 2004. (Tr. 261). Plaintiff complained of lots of depression and nervousness around others. (Id.). Plaintiff reported

---

[4]Vistaril is indicated for the treatment of anxiety. See PDR at 2659.

[5]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[6]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV at 32.

[7]High blood pressure. Stedman's at 927.

that his nine-year-old daughter has a brain tumor and his wife recently had a heart attack and has kidney problems.  (Id.).  Plaintiff indicated that he feared his daughter's or wife's death.  (Id.).  Plaintiff was currently taking Lexapro[8] for depression.  (Id.).  Plaintiff reported feeling depressed all the time, experiencing constant worry, poor anger control, low self-esteem, increased sleep, moodiness, constant low energy, and feelings of guilt, worthlessness, and hopelessness.  (Id.).  Plaintiff also reported loss of interest in activities, poor concentration, poor memory, and intrusive thoughts about when his daughter will die.  (Id.).  Plaintiff indicated that even prior to the current stressors with his family, he could not hold a job because he would feel uncomfortable or would become depressed and would quit.  (Id.).  Angela Lutmer, Clinical Therapist, diagnosed plaintiff with major depressive disorder,[9] recurrent, severe without psychotic features, and assessed a current GAF of 55[10] and the highest GAF in the past year of 70.[11]  (Tr. 263).

Plaintiff presented to Crosstrails Medical Center on December 21, 2004, at which time he was diagnosed with anxiety and depression.  (Tr. 300).

Plaintiff saw Ms. Lutmer for therapy on January 11, 2005.  (Tr. 260).  Plaintiff reported

---

[8]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 3532.

[9]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  See Stedman's at 515.

[10]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[11]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

feeling edgy and irritable. (Id.). Plaintiff indicated that he sleeps twelve hours a day and has no motivation. (Id.). Plaintiff reported a slight increase in energy level and stated that he is concerned about his wife needing dialysis. (Id.). Plaintiff was taking Effexor. (Id.). Ms. Lutmer found that plaintiff's mood was depressed and anxious, his thought content was appropriate, his insight was fair, his behavior was appropriate with adequate impulse control, his affect was incongruent with mood and broad, his thought process was coherent, and his judgment was fair. (Id.).

Plaintiff saw Michael C. Gaertner, D.O. on January 12, 2005. (Tr. 272). Plaintiff complained of new onset type 2 diabetes, hypertension, and chronic anxiety. (Id.). Plaintiff stated that his mind was all over the place and he has difficulty staying focused. (Id.). Plaintiff also complained of sinus problems. (Id.). Dr. Gaertner's assessment was sinusitis, probable, adult attention deficit hyperactivity disorder,[12] hypertension, and type 2 diabetes.[13] (Id.). Dr. Gaertner refilled plaintiff's medications. (Tr. 273). Dr. Gaertner started plaintiff on Benicar,[14] and Ritalin.[15] (Id.).

Plaintiff saw Dr. Gaertner for a follow-up on January 18, 2005, at which time plaintiff reported that he had stopped taking the Ritalin because it made him more hyper and anxious. (Tr. 271). Dr. Gaertner noted that plaintiff had fairly severe depression. (Id.). Plaintiff reported that

---

[12]A behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness, impulsiveness, and hyperactivity. See Stedman's at 568.

[13]A condition characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently. Stedman's at 530.

[14]Benicar is indicated for the treatment of hypertension. See PDR at 2977.

[15]Ritalin is indicated for the treatment of attention deficit disorders. See PDR at 2305.

he stayed in the house for almost a year and that his wife obtained medication for him by feigning his symptoms and getting medications prescribed to her for him.  (Id.).  Plaintiff stated that he has tried multiple psychiatric medications but they did not provide any relief.  (Id.).  Plaintiff also reported difficulty sleeping.  (Id.).  Dr. Gaertner's impression was depression; mood disorder, possible depression and/or bipolar disorder;[16] and obstructive sleep apnea.[17]  (Id.).  Dr. Gaertner referred plaintiff for a sleep study.  (Id.).  He also referred plaintiff to psychiatry.  (Id.). Dr. Gaertner noted that plaintiff's counselor wanted to try mood stabilizers, so he prescribed Depakote.[18]  (Id.).

Plaintiff saw Abel Corral, M.D. for a Mental Status Evaluation on January 19, 2005.  (Tr. 293-94).  Plaintiff reported feeling helpless, hopeless, worthless, and tired all the time.  (Tr. 294).  Plaintiff's wife stated that plaintiff spends a lot of time barricading himself in the privacy of his own home.  (Id.).  Plaintiff indicated that he had been taking several medications but his insurance does not pay for Paxil, Lexapro, or Effexor and he discontinued the medications.  (Id.).  Plaintiff denied psychotic indices such as delusions and hallucinations and denied suicidal thoughts.  (Id.).  Dr. Corral diagnosed plaintiff with major depression recurring episode; rule out bipolar disorder;

---

[16]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

[17]A disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway with resultant hypoxemia and chronic lethargy.  See Stedman's at 119.

[18]Depakote is indicated for the treatment of the manic episodes associated with bipolar disorder.  See PDR at 432.

and assessed a GAF of 40-50.[19]  Dr. Corral recommended that plaintiff continue taking Depakote and start taking Topamax.[20]  (Id.).

Plaintiff saw Ms. Lutmer for counseling on January 25, 2005.  (Tr. 259).  Plaintiff reported that he had seen a psychiatrist who started him on Depakote, which he indicated slowed him down somewhat.  (Id.).  Plaintiff stated that his wife may need a transplant.  (Id.).  Plaintiff discussed problems with anger and impulsivity.  (Id.).  Ms. Lutmer found that plaintiff had a depressed, anxious and elevated mood, appropriate but negative thought content, fair insight and judgment, restless behavior, affect that was congruent with mood, and a coherent thought process.  (Id.).

Plaintiff saw Dr. Corral on January 26, 2005, at which time he reported that the Depakote did not work.  (Tr. 290).  Plaintiff reported that he has destroyed things in the house when he gets mad.  (Id.).  Plaintiff acknowledged doing wrong things and reported that he is totally out of control.  (Id.).  Dr. Corral discussed with plaintiff the diagnosis of passive aggressive personality. (Id.).  Plaintiff indicated that he had done well in the past on Zoloft.[21]  (Id.).  Dr. Corral prescribed Zoloft.  (Id.).  Plaintiff indicated that his medications may help him find a job.  (Id.).

_____

[19]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is as times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV at 32.  A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

[20]Topamax is indicated for the treatment of seizures.  See PDR at 2503.

[21]Zoloft is indicated for the treatment of major depressive disorder and panic disorder. See PDR at 2676.

Plaintiff saw Ms. Lutmer on February 8, 2005, at which time he reported that his brother just had a heart attack and that he was feeling hurt. (Tr. 258). Plaintiff denied any suicidal thoughts but stated that he would not mind going to sleep and not waking up. (Id.). Plaintiff reported lots of grief and loss issues. (Id.). Plaintiff indicated that he sleeps all the time and is back on Zoloft. (Id.). He stated that his doctor ruled out bipolar disorder as a diagnosis. (Id.). Ms. Lutmer discussed finding positive things in plaintiff's life and in himself to live for. (Id.). Ms. Lutmer found that plaintiff's mood was depressed, anxious, angry, and irritable; his thought content was appropriate and negative; his insight was fair; he exhibited adequate impulse control; his affect was incongruent with mood; his thought process was tangential at times; and his judgment was fair. (Id.).

Plaintiff saw Pam Klosterman, F.N.P., at Dr. Gaertner's office on February 14, 2005, for medication refills. (Tr. 269). Plaintiff's blood pressure was slightly elevated. (Id.). Ms. Klosterman diagnosed plaintiff with depression, mood disorder, type 2 diabetes, hyperlipidemia,[22] hypertension, and upper respiratory infection. (Id.). She refilled plaintiff's medications. (Tr. 270).

Plaintiff saw Ms. Lutmer on February 15, 2005, at which time he reported that his daughter's brain tumor had decreased in size. (Tr. 257). Plaintiff indicated that his mood is a little better due to the news about his daughter. (Id.). Plaintiff rated his mood as a five on a scale of one to ten. (Id.). Plaintiff reported low energy. (Id.). Ms. Lutmer found that plaintiff's mood was irritable, his thought content was appropriate and realistic, his insight was poor, his affect was incongruent with mood, his thought process was coherent, and his judgment was fair. (Id.).

---

[22]Elevated levels of lipids in the blood plasma. Stedman's at 922.

Plaintiff saw Dr. Corral on February 22, 2005, at which time he was very negative. (Tr. 287). Plaintiff reported that the Zoloft was working and his wife reported that the Zoloft was making him very optimistic and pleasant. (Id.). Dr. Corral stated that plaintiff still had a negative attitude. (Id.). Plaintiff exhibited a negative attitude about his wife's need for a kidney transplant. (Id.). Plaintiff indicated that he spends time in his room and does not socialize. (Id.). Plaintiff reported that he was depressed. (Id.). Dr. Corral tried to stabilize plaintiff with psychotherapy so that he could function in society. (Id.). Dr. Corral indicated that after thirty minutes of psychotherapy, plaintiff was able to relate more effectively. (Id.).

Plaintiff saw Dr. Gaertner on February 24, 2005, at which time he reported that he was probably doing a little better, with less anger outbursts and mood swings. (Tr. 268). Dr. Gaertner indicated that the sleep study plaintiff underwent was inconclusive, revealing mild obstructive sleep apnea at best. (Id.). Plaintiff's blood pressure was under fairly good control although his blood sugar levels were high. (Id.). Dr. Gaertner's assessment was type 2 diabetes, hypertension, hyperlipidemia, depression, and possible sleep apnea. (Id.).

Holly L. Werner, Psy.D., a state agency psychiatrist, completed a Mental Residual Functional Capacity Assessment on March 8, 2005. (Tr. 108-110). Dr. Werner expressed the opinion that plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.). Dr. Werner also completed a Psychiatric Review Technique. (Tr. 112-125). Dr. Werner found that plaintiff suffered from depression, anxiety, and a substance

addiction disorder. (Tr. 112). Dr. Werner expressed the opinion that plaintiff's mental impairments cause mild limitations in plaintiff's activities of daily living and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 122). Dr. Werner found that plaintiff's mental impairments cause moderate limitations in plaintiff's ability to maintain social functioning. (Id.).

Plaintiff saw Dr. Corral on March 24, 2005, at which time plaintiff reported that he was going through a lot of stress. (Tr. 280). Plaintiff had gone to the emergency room and talked to a physician, who prescribed Xanax.[23] (Id.). Plaintiff reported that he thinks about suicide but he has decided he has to live for his daughters. (Tr. 279). Plaintiff's wife had been hospitalized and needed a pancreas transplant. (Tr. 280). Dr. Corral recommended that plaintiff continue taking his medications regularly. (Id.).

Plaintiff saw Ms. Lutmer on March 31, 2005, at which time plaintiff reported that his wife had five stints put in her heart and had to start dialysis. (Tr. 256). Plaintiff denied any suicidal thoughts or ideations but appeared very stressed and apathetic, stating "what is the point." (Id.). Ms. Lutmer found that plaintiff's mood was irritable, his thought content was appropriate, his insight was fair, his behavior was restless, his affect was incongruent with mood at times, his thought process was coherent, and his judgment was fair. (Id.).

Plaintiff saw Dr. Gaertner on March 31, 2005, with complaints of insomnia and depression. (Tr. 267). Plaintiff indicated that he had taken his wife's Ambien,[24] which helped. (Id.). Dr. Gaertner's assessment was insomnia. (Id.). He prescribed Ambien. (Id.).

---

[23]Xanax is indicated for the management of anxiety disorder. See PDR at 2794.

[24]Ambien is indicated for the short-term treatment of insomnia. See PDR at 2980.

Plaintiff presented to Missouri Southern Healthcare emergency department on March 29, 2005, with complaints of chest pain. (Tr. 218). Plaintiff underwent a cardiac stress test, which was normal. (Tr. 220).

Plaintiff presented to Dr. Corral on April 20, 2005, requesting to see Dr. Corral as an emergency. (Tr. 276). Plaintiff reported going through a lot of stress. (Id.). Plaintiff stated that his wife was in the hospital with an infection. (Id.). Plaintiff reported that his medications helped. (Id.).

Plaintiff saw Ms. Lutmer on April 26, 2005, at which time he indicated that things had been going better but his wife was hospitalized with an infection and he has been under a lot of stress. (Tr. 255). Plaintiff reported significant worry, stress, crying and disturbed sleep. (Id.). Plaintiff indicated that he thought of leaving the situation and that his family might be better off dead, although he denied any intent to harm his family. (Id.). Plaintiff agreed to try group therapy. (Id.). Ms. Lutmer found that plaintiff's mood was irritable, his thought content was appropriate, his insight was poor, his behavior was restless, his affect was incongruent with mood, his thought process was tangential with loose associations and his judgment was fair. (Id.).

Plaintiff saw Dr. Gaertner on May 2, 2005, at which time he reported having quite a bit of problems with depression and his moods. (Tr. 266). Plaintiff stated that he did not notice a difference with the Zoloft and Topamax. (Id.). Plaintiff indicated that his moods are up and down a lot. (Id.). Plaintiff stated that he was better in terms of being able to go out of the house and function to some degree, but he was still having quite a bit of difficulty. (Id.). Dr. Gaertner found that plaintiff's mood and affect were normal. (Id.). Dr. Gaertner's assessment was mood

disorder, probably bipolar disorder. (Id.). Dr. Gaertner started plaintiff on Seroquel[25] and increased his dosage of Zoloft. (Id.).

Plaintiff saw Ms. Lutmer on May 10, 2005, at which time he reported that he had been under a lot of stress and was thinking about options. (Tr. 254). Plaintiff indicated that his medications were helping somewhat. (Id.). Plaintiff exhibited a lot of self-doubt and guilt. (Id.). Plaintiff was encouraged to attend group therapy to continue developing coping skills. (Id.). Ms. Lutmer found that plaintiff's mood was slightly irritable, his thought content was appropriate, his insight was fair, his behavior was restless although he exhibited adequate impulse control, his affect was incongruent with mood, his thought process was coherent, and his judgment was fair. (Id.).

Plaintiff saw Ms. Lutmer on August 10, 2005, at which time he reported decreased appetite with some weight loss and very low energy. (Tr. 250). Plaintiff reported some recent deaths in the family and conflict with his oldest daughter. (Id.). Ms. Lutmer found that plaintiff's mood was anxious, his thought content was appropriate and realistic, his insight was fair, his behavior was restless and fidgeting, his affect was inappropriate at times, his thought process was coherent, and his judgment was fair. (Id.).

Plaintiff presented to the emergency room at Missouri Southern Healthcare on August 19, 2005, with complaints of weakness, dizziness, and neck and shoulder pain. (Tr. 213).

On August 25, 2005, plaintiff underwent an ultrasound of the right upper quadrant due to complaints of nausea, bloating, and abdominal pain. (Tr. 210). No acute abnormalities were

---

[25]Seroquel is an antipsychotic drug indicated for the treatment of schizophrenia. See PDR at 682.

found.  (Id.).

Plaintiff saw Ms. Lutmer on September 13, 2005, at which time he reported that he was no longer on Xanax and that his wife and daughter were both sick.  (Tr. 249).  Plaintiff denied any suicidal or homicidal thoughts but reported increased depressive symptoms and anxiety.  (Id.).  Ms. Lutmer found that plaintiff's mood was depressed and anxious, his thought content was appropriate and realistic, his insight was fair, his behavior was restless, his affect was incongruent with his mood, his thought process was coherent, and his judgment was fair.  (Id.).

Plaintiff saw Ms. Lutmer on September 28, 2005, at which time he reported that he had been more depressed for the past week and that his motivation and energy were low.  (Tr. 248).  Ms. Lutmer focused the session on increasing plaintiff's coping skills through cognitive techniques.  (Id.).  Ms. Lutmer found that plaintiff's mood was depressed, his thought content was appropriate and realistic, his insight was fair, his behavior was appropriate, his affect was incongruent with his mood, his thought process was coherent, and his judgment was fair.  (Id.).

Plaintiff saw Khursheed Zia, M.D., staff psychiatrist at Bootheel Counseling Services, on October 14, 2005, for an evaluation at the request of Ms. Lutmer.  (Tr. 246).  Plaintiff reported increased depression, low self-esteem, and a low energy level.  (Id.).  Dr. Zia indicated that plaintiff was taking Seroquel and Zoloft.  (Id.).  Dr. Zia found that plaintiff's mood was depressed, his affect was tense and anxious, his thought process was organized and goal directed, paranoia was present, his intelligence was average, and his insight and judgment were not impaired.  (Tr. 247).  Dr. Zia diagnosed plaintiff with major depressive disorder, recurrent, severe

with psychotic features and generalized anxiety disorder,[26] and assessed a GAF of 55. (Id.). Dr. Zia increased plaintiff's dosage of Zoloft, continued the Seroquel, and started plaintiff on Buspar.[27] (Id.).

Plaintiff saw Ms. Lutmer on October 25, 2005. (Tr. 245). Ms. Lutmer indicated that plaintiff had presented for group therapy but was the only member present so the clinician met with plaintiff for an individual session. (Id.). Plaintiff discussed times in the past when he had suicidal and homicidal thoughts and recognized that he had made some progress. (Id.). Plaintiff was encouraged to attend group therapy. (Id.). Ms. Lutmer found that plaintiff's mood was anxious and worried, his thought content was appropriate, his insight was good, his behavior was appropriate, his affect was incongruent with his mood, his thought process was coherent, and his judgment was fair. (Id.).

Plaintiff presented to Bloomfield Medical Clinic on January 18, 2006 for a blood pressure check. (Tr. 187). Plaintiff indicated that the Benicar was working but the doctor changed it. (Id.). The assessment of the examining physician was headaches, insomnia, depression, and bipolar disorder. (Tr. 188).

Plaintiff presented to Bloomfield Medical Clinic on February 15, 2006, for refills of his Zoloft and Xanax. (Tr. 183).

Plaintiff presented to Missouri Southern Healthcare on April 6, 2006, with complaints of nausea, mid-abdominal pain, diarrhea, abdominal distention, and eructation. (Tr. 196). Plaintiff

---

[26]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. Stedman's at 569.

[27]Buspar is indicated for the treatment of anxiety. See PDR at 2517.

underwent a colonoscopy, which revealed a small hiatal hernia,[28] mild gastritis,[29] and some small internal hemorrhoids. (Tr. 198).

Plaintiff saw Jonathan D. Rosenboom, Psy. D. on June 15, 2006, for a psychological consultative examination at the request of the Commissioner. (Tr. 156-61). Plaintiff complained of depression and anxiety. (Tr. 157). Plaintiff stated that being around people makes him anxious. (Id.). Plaintiff reported a history of suicidal thoughts and stated that he almost killed himself on a number of occasions. (Tr. 157-58). Plaintiff indicated that he had experienced mental disorder symptoms for ten years. (Id.). Plaintiff also reported being sexually abused. (Tr. 158). Dr. Rosenboom found that plaintiff's mood was moderately sad. (Tr. 159). Plaintiff was irritable and overly dramatic during the interview, seeming to exaggerate the intensity of mental disorder symptoms. (Id.). Plaintiff scored well within the average range on the Mini Mental State Exam, a tool to screen adults for the gross signs of neurocognitive impairment. (Id.). Dr. Rosenboom administered the MMPI-2, a widely used test to screen for personality disorders and psychopathological states. (Id.). Dr. Rosenboom stated that plaintiff's MMPI-2 scores were indicative of a deviant response, that plaintiff was "faking bad." (Tr. 160). Plaintiff answered questions in a direction rarely observed in the most severely disordered psychiatric inpatients. (Id.). Dr. Rosenboom stated that patients who answer in this manner are seen as exaggerating the scope or intensity of their actual mental disorder symptoms. (Id.). Dr. Rosenboom found that plaintiff's report did meet and exceed the minimum diagnostic criteria needed to diagnose a major

---

[28]Hernia of a part of the stomach through the esophageal hiatus of the diaphragm. Stedman's at 880.

[29]Inflammation, especially mucosal, of the stomach. Stedman's at 790.

depressive disorder and a panic disorder without agoraphobia.  (Id.).  Dr. Rosenboom diagnosed

plaintiff with malingering,[30] major depressive disorder by history, and panic disorder without

agoraphobia by history.[31]  (Id.).  He assessed a GAF of 58.  (Tr. 161).  Dr. Rosenboom stated that

plaintiff's history and presentation during the examination was consistent with him suffering from

a major depressive disorder, although he exaggerated the scope and intensity of his symptoms.

(Id.).  Dr. Rosenboom expressed the opinion that plaintiff's ability to understand, remember, and

carry out instructions was not impaired by his mental disorders, his ability to respond

appropriately to work supervisors was moderately impaired by his antisocial personality features,

and he possesses the capacity to manage his finances.  (Id.).

Plaintiff underwent an MRI of the lumbar spine[32] on July 10, 2006, which revealed

degenerative disc disease[33] at the L4-5 level with impingement of the left L5 nerve; and

degenerative disc disease at the L5-S1 level with no neural impingement.  (Tr. 311).

Plaintiff saw Thomas Satterly, D.O. on October 4, 2006, for treatment of low back pain

that radiated to his left leg.  (Tr. 313).  Plaintiff reported that the pain started two years prior

---

[30]Feigning illness or disability to escape work, excite sympathy, or gain compensation.
See Stedman's at 1147.

[31]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[32]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms,
the cervical region of the spinal column is the neck; the thoracic region is the main part of the
back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic
vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.
The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information
Systems for Lawyers, § 6:27 (1993).

[33]A general term for both acute and chronic processes destroying the normal structure and
function of the intervertebral discs.  See Medical Information Systems for Lawyers, § 6:201.

- 21 -

when he injured his back at work and that the pain had gradually gotten worse. (Id.). Dr.

Satterly's impression was lumbar disc disease with radiculopathy. (Id.). Dr. Satterly performed a

manipulation of the lumbar spine under anesthesia and administered an epidural steroid injection.

(Tr. 315).


## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant meets the non-disability requirements for a Period of Disability and
       Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act
       and is insured through the date of this decision.

2.     The claimant has not engaged in substantial gainful activity since the alleged onset
       of disability.

3.     The claimant has degenerative disc disease at L4-5 and L5-S1 with an
       impingement of the left L5 nerve, diabetes, obesity, and high blood pressure. This
       combination of impairments is severe. Since his alleged onset date of disability, the
       claimant has had no severe mental impairment which has lasted for 12-continuous
       months.

4.     These medically determinable impairments do not meet or medically equal one of
       the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The undersigned finds the claimant's allegations regarding his limitations are not
       totally credible for the reasons set forth in the body of the decision.

6.     The claimant's impairments preclude occasional lifting and carrying of more than
       50 pounds and frequently lifting and carrying more than 25 pounds. There are no
       limitations in sitting, standing or walking. There are no non-exertional
       limitations.

7.     The claimant has past relevant work as a truck driver.

8.     The claimant's past relevant work as a truck driver, as it is described by the
       claimant and generally performed, is not precluded by his residual functional
       capacity (20 CFR § 404.1565 and 416.965).

9.      The claimant did not sustain his burden of proving that he cannot perform his past relevant work as a truck driver.

10.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 19-20).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on January 24, 2005, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

It is further the decision of the Administrative Law Judge that, based on the application filed on January 24, 2005, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.     Plaintiff's Claims

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in finding his mental impairments not severe.  Plaintiff next argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation.   The undersigned will address these claims in turn.  The undersigned will also discuss the ALJ's residual functional capacity determination, as plaintiff indirectly challenges this determination as well.

## 1.     Presence of a Severe Mental Impairment

Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling as well as capacities for seeing, hearing, and speaking.  See 20 C.F.R. § 404.1520(b)(1),(2).  Basic work activities also include understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  See 20 C.F.R. § 404.1520(b)(3)-(6).  Age,

education and work experience of a claimant are not considered in making the "severity" determination. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). While the burden is not great, the claimant bears the burden at step two to demonstrate a severe impairment that significantly limits the ability to perform basic work activities. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). The sequential evaluation process may be terminated at step two when the claimant's impairment or combination thereof would have no more than a minimal effect on the claimant's ability to work. See Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001).

The ALJ found that plaintiff's mental impairments were not severe. (Tr. 17). The ALJ stated that plaintiff's mental impairments did not prevent him from working. (Id.). The ALJ found that with treatment, plaintiff showed significant improvements in his mental impairments. (Id.). The ALJ pointed out that consultative psychiatrist Dr. Rosenboom diagnosed plaintiff with malingering. (Id.). The ALJ concluded that the medical evidence demonstrates that plaintiff's mental impairments have less than a minimal effect on his ability to perform work-related functions and are consequently non-severe. (Id.).

The ALJ's finding that plaintiff does not have a severe mental impairment is not supported by substantial evidence in the record. The objective medical evidence of record reveals that plaintiff suffers from depression, anxiety, and possible bipolar disorder, which have more than a minimal effect on his ability to perform work-related activities. This objective medical evidence cannot be ignored solely due to plaintiff's questionable credibility.

Plaintiff was voluntarily admitted to Southeast Missouri Mental Health Center on July 23, 1997, due to suicidal thoughts. (Tr. 167). Although plaintiff later admitted that he was not

suicidal, he was diagnosed with mood disorder and personality disorder at that time and was referred to counseling and a psychiatrist. (Tr. 168-69).

Plaintiff complained of depression at a visit to Crosstrails Medical Center on November 12, 2004, and was prescribed Effexor. (Tr. 304). Plaintiff began seeing Angela Lutmer, Clinical Therapist, for counseling on December 7, 2004, at which time plaintiff complained of significant depression and nervousness around people. (Tr. 261). Ms. Lutmer diagnosed plaintiff with severe major depressive disorder and assessed a GAF of 55. (Id.). Plaintiff received regular counseling from Ms. Lutmer for his depression and anxiety through October 2005. (Tr. 245-60).

Plaintiff also saw Dr. Michael Gaertner for treatment of his mental impairments. On January 18, 2005, Dr. Gaertner diagnosed plaintiff with "fairly severe depression," and possible bipolar disorder and prescribed the mood stabilizer Depakote. (Tr. 271).

Plaintiff saw Dr. Abel Corral for a mental evaluation on January 19, 2005, at which time plaintiff was diagnosed with major depression, rule out bipolar disorder, was assessed a GAF of 40-50, and was prescribed Topamax. (Tr. 294). On January 26, 2005, Dr. Corral added Zoloft. (Tr. 290). Plaintiff saw Dr. Corral on February 22, 2005, at which time plaintiff was very negative and reported staying in his room. (Tr. 287). Dr. Corral indicated that he was trying to stabilize plaintiff with psychotherapy so that he could "function in society." (Id.).

In March 2005, the state agency physician, Dr. Werner, found that plaintiff was moderately limited in his ability to understand and remember detailed instructions, work with others, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers. (Tr. 108-10). Dr. Werner found that plaintiff's mental impairments cause mild limitations in plaintiff's activities of daily living, mild difficulties in maintaining concentration,

persistence or pace, and moderate limitations in plaintiff's ability to maintain social functioning. (Tr. 122).

On October 14, 2005, Dr. Khursheed Zia diagnosed plaintiff with severe major depressive disorder with psychotic features and generalized anxiety disorder, and assessed a GAF of 55. (Tr. 247).

Finally, although Dr. Rosenboom, the consulting psychiatrist, diagnosed plaintiff with malingering, he still found that plaintiff's history and presentation during the examination were consistent with his suffering from a major depressive disorder and assessed a GAF of 58. (Tr. 161). Dr. Rosenboom also found that plaintiff's ability to respond appropriately to work supervisors was moderately impaired. (Id.).

In sum, the medical record reveals that plaintiff suffers from significant mental impairments. Plaintiff received regular and frequent treatment for his mental impairments from psychiatrists, regular physicians, and counselors from November 2004 through the date of the hearing. Plaintiff's mental impairments were treated with therapy and many pscyhotropic drugs. Every mental health professional that examined plaintiff expressed the opinion that plaintiff's mental impairments were severe. Although the record indicates that plaintiff benefitted from treatment, his mental impairments persisted and continued to be severe. Even Dr. Rosenboom, who diagnosed plaintiff with malingering, found that plaintiff's major depressive disorder had more than a minimal effect on his ability to perform work-related activities.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a mental residual functional capacity for plaintiff based on the medical evidence in the record and to obtain vocational expert testimony if needed.

2.      **Credibility Determination**

Plaintiff next argues that the ALJ erroneously found his subjective complaints of pain and

limitation not credible.  Specifically, plaintiff contends that the ALJ improperly required objective

evidence of pain.  Defendant contends that the ALJ's credibility determination is supported by

substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not

be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement

agreement between Department of Justice and class action plaintiffs who alleged that the

Secretary of Health and Human Services unlawfully required objective medical evidence to fully

corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective

allegations of pain and limitation, in doing so the ALJ "must make an express credibility

determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the

consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of

the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the

medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141

F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's

subjective complaints of pain and limitations is supported by substantial evidence in the record as

a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully

credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 18). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed the medical evidence. The ALJ found that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ noted that plaintiff's treatment for his back impairment has been sparse. (Tr. 18). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ also stated that when plaintiff has sought treatment for his back impairment, this treatment was routine and conservative in nature. (Tr. 18). The ALJ noted that all of plaintiff's treatment has been rendered by a general practitioner rather than a specialist. (Id.).

The ALJ found that plaintiff's elevated blood pressure and blood sugar levels have not resulted in any complications. (Tr. 16). This finding is supported by the medical record. Further, plaintiff's attorney stated during the hearing that these conditions were controlled with

medication.  (Tr. 382).

The ALJ stated that plaintiff has worked for years with his impairments.  (Tr. 17).  The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

As discussed above, the ALJ noted that Dr. Rosenboom diagnosed plaintiff with malingering.  (Tr. 16).  The ALJ properly found that the diagnosis of malingering detracts from plaintiff's allegations of disability.  (Id.).

The ALJ next discussed plaintiff's motivation.  (Tr. 18).  The ALJ stated that plaintiff has indicated that he worries about finances and that both his wife and his daughter are on disability.  (Tr. 19).  Although not dispositive, an ALJ may consider a claimant's financial motivation to qualify for benefits when assessing the credibility of a claimant's subjective pain complaints.  See Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002).

Finally, the ALJ discussed plaintiff's testimony at the administrative hearing.  (Tr. 19).  The ALJ found that plaintiff's responses were evasive or vague at times, which left the impression that plaintiff may have been less than candid.  (Id.).  The ALJ pointed out that, although plaintiff was once arrested and spent the night in jail for not paying child support, plaintiff only indicated that he had been arrested and jailed for traffic offenses.  (Id.).

An administrative opinion must establish that the ALJ considered the appropriate factors.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033,

1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 3. **Residual Functional Capacity**

After properly assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> The claimant has the burden of proving that disability results from a medically determinable impairment or combination of impairments. Nothing stated in this decision is meant to suggest or imply that the claimant does not have genuine medical problems with some functional limitations. However, based upon the totality of the evidence and giving the claimant the benefit of the doubt as to the severity of his impairments, the Administrative Law Judge finds that the claimant has the residual functional capacity to occasionally lift 50 pounds and frequently lift 25 pounds. There are no restrictions in sitting, standing or walking. He can perform a full range of work at the medium exertional level.

(Tr. 19).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000)).

The ALJ's residual functional capacity determination is not supported by substantial evidence. The ALJ does not discuss or otherwise point to any medical evidence that supports his conclusions as to plaintiff's residual functional capacity. The ALJ did not obtain the opinion of a state consultative physician, nor did he obtain source statements from plaintiff's treating physicians.

Plaintiff underwent an MRI of the lumbar spine on July 10, 2006, which revealed degenerative disc disease at the L4-5 level with impingement of the left L5 nerve and degenerative disc disease at the L5-S1 level. (Tr. 311). Dr. Satterly diagnosed plaintiff with lumbar disc disease with radiculopathy and performed a manipulation of the lumbar spine under anesthesia and administered an epidural steroid injection. (Tr. 315). Plaintiff's back impairment can reasonably be expected to produce pain and limitations. Plaintiff testified that he experiences constant back pain and that he has difficulty bending, getting up from a sitting position, and standing. (Tr. 392). Plaintiff further testified that he could lift 25 pounds at the most. (Tr. 393). The ALJ did not take any of these limitations into consideration.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712. Here, there is no medical evidence in the record from any physician addressing plaintiff's physical ability to function in the workplace. Thus, the ALJ's residual functional capacity fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703. Additionally, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's physical ability to function in the workplace.

Accordingly, this court will recommend that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new physical residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace. The ALJ should also formulate a new mental residual functional capacity based on the medical evidence in the record and obtain vocational expert testimony if needed.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) days, until September 8, 2008, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this ___26th___ day of August, 2008.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE